**Luther GEORGE and Wife, Helen George, Appellants,**

v.

**BEAVARK, INC., and James Cypert, Appellees.**

**No. 19175.**

United States Court of Appeals
Eighth Circuit.

Nov. 12, 1968.

Owen C. Pearce, Fort Smith, Ark., for appellants; David A. Stewart, Fort Smith, Ark., and Thomas R. Fox, Dallas, Tex., on the brief.

James W. Gallman, Fayetteville, Ark., for appellees; E. J. Ball, Fayetteville, Ark., and James Cypert, in pro. per., on the brief.

Before MATTHES, MEHAFFY and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

■ Luther George and Helen George, his wife, petitioned in the United States District Court for the Western District of Arkansas in admiralty for limitation of their liabilities under 46 U.S.C.A. § 185 and related federal statutes.[1]

Petitioners were the owners of a 38-foot-long boat, the RIVER QUEEN, which was moored at the Hickory Creek Boat Dock on Beaver Lake, a man-made lake formed by the building of a dam on the upper reaches of the White River in Northwest Arkansas. The river in that area flows north from Beaver Lake in Arkansas across the Missouri line and then curls back into Arkansas. In the early morning of March 26, 1967, fire broke out on the RIVER QUEEN, virtually destroying it, and damaging the boat dock and other boats moored in adjacent slips of the dock.

By this petition in admiralty, petitioners seek to use the federal statutes to limit their liability to $510.00, the salvage value of the RIVER QUEEN.

■ If the river was navigable prior to construction of the dam, it continues to be considered as a navigable stream. United States v. Appalachian Elec. Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Economy Light & Power Co. v. United States, 256 U.S. 113, 118, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

■ The sole issue on this appeal is whether "float fishing" constitutes such commerce and transportation as to characterize the stream as navigable, thus affording petitioners the advantages of the federal statutes above referred to. As stated in petitioners' brief:

"We have made no claim in this case that White River has been navigated, and that commerce and transportation have existed on White River, in a manner comparable to that on the larger rivers of the country. We have claimed merely that there has been at least one significant type of commerce and transportation, namely float fishing. Actually, in this Record there is a suggestion of two other types of commerce and transportation, namely the floating of staves or logs (R. 42–43), and the business of trapping fur-bearing animals (R. 44); but the Record does not show them to be significant."

The case was tried to the district court upon answers to interrogatories, live testimony and stipulated evidence. The Honorable John E. Miller, a distinguished and experienced senior district judge, in a very thorough opinion published in 275 F.Supp. 403 under the title of In re River Queen dismissed the petition for lack of jurisdiction, and we affirm.

1. 46 U.S.C.A. § 185 provides:
"The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter and the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title, or (b) at his option shall transfer, for the benefit of claimants, to a trustee to be appointed by the court his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title. Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease."

The purpose of this type of legislation, which in a sense is a subsidy, was to strengthen the maritime industry in the United States so that it could better meet foreign competition and encourage the development of a strong merchant marine fleet. Perhaps no need presently exists for such statutes but so long as Congress sees fit to retain the statutes it is the courts' duty to observe them.

There is little or no factual dispute. Petitioners had leased dock space under an oral contract and after occurrence of the fire collected the insurance carried on the RIVER QUEEN and bought the salvage for the net sum of $510.00. Aside from the answers to the interrogatories, the evidence was elicited from fishing guides who each testified that at times he took parties during the fishing season on float trips lasting from one to seven days. They used what were described as old John or old river boats which were of light draft and flat bottomed, usually from 16 to 18 feet long, which would accommodate the guide and two persons and their gear. Of necessity this type boat was used because the river consisted of slow-moving deep holes interspersed by shallow water and shoals and, in fact, was negotiable only by these flat bottomed boats with a draw of from two to at most six inches of water, depending upon the load. No motors were used on the boats and while the guides would paddle over most of the shoals the stream was not such that a modern motor-propelled ski boat could be operated upon it. There is no history of the stream's being used commercially for hauling passengers or goods and no barges were ever seen on the river. The guides, of course, knew where the rapids and shoals were. Customarily, if the trip was an overnight one the fishing party would camp out on a gravel bar and in case of bad weather would sometimes erect a tent. There were also locations along the river where the float party could stop and be met by a car and trailer, enabling them to spend the night with more comfortable accommodations than on the river bank. If the trip continued, they could return and float the following day. They would eventually be met by someone in a car with a trailer or have one stationed where they knew they were going to put in and have need for it. There was no showing or claim that persons or regional products were ever transported commercially upon the river. Float fishing is nothing more than pleasure fishing and is conducted in much the same manner as game fishing in most any lake or stream, the main difference being that in a stream such as this a guide is necessary to negotiate the shoals, and the use of motorless flat bottomed boats such as described is necessary. Float fishing in this area is popular as it lends itself to a pleasurable as well as scenic adventure. Such pastime, however, standing alone is too fragile a basis to support a holding of legal navigability, absent any evidence of a channel of useful purpose to trade or commerce.

From time to time our admiralty laws have been liberalized to accommodate the needs and growth of our country. Always, however, there has existed a pragmatic reason which is nonexistent in the situation here. Originally, it was held, based on English common law, that admiralty jurisdiction was limited to navigable waters within the ebb and flow of the tide. The Steamboat Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 328 (1825). This rule, however, was abandoned in The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), where it was held that jurisdiction depended upon the navigable character of the water and not upon the ebb and flow of the tide. In the landmark case of The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), it was ruled that rivers are regarded as public navigable rivers in law which are navigable in fact, and that rivers are navigable in fact when they are used or susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The rule was further liberalized in The Montello, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874), to include rivers difficult to navigate because of obstructions, and this case placed emphasis upon the past history of rivers rather than the present nonnavigability and held that navigability does not depend upon the mode by which commerce is conducted upon it.

It is significant, however, to note that the Court in this case stated at page 442:

"It is not, however, as Chief Justice Shaw said, [Rowe v. Bridge Co., 21 Pickering, Mass., 344] 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.' "

There is no real problem in arriving at a general definition of navigable waters. Petitioners cite the definition found in Guinn, An Analysis of Navigable Waters of the United States, 18 Baylor L.Rev. 559 (1966).[2]

The Supreme Court has often defined the test for navigability. In United States v. State of Utah, 283 U.S. 64, at page 76, 51 S.Ct. 438, 441, 75 L.Ed. 844 (1931), the Court expressed itself as follows:

"The test of navigability has frequently been stated by this Court. In The Daniel Ball, 10 Wall. 557, 563 [19 L.Ed. 999,] the Court said: 'Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel

on water.' In The Montello, 20 Wall. 430, 441, 442, [22 L.Ed. 391] it was pointed out that 'the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation,' and that 'it would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway.' The principles thus laid down have recently been restated in United States v. Holt State Bank, 270 U.S. 49, 56, [46 S.Ct. 197, 70 L.Ed. 465] where the Court said:

" 'The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.' "

2. Professor Guinn defines the rule for admiralty purposes at pages 577–578 as follows:

"In reliance upon these cases, perhaps one could properly declare the rule of navigability for admiralty purposes to be: Those rivers, streams and lakes must be regarded as public navigable waters in law which are navigable in fact. They are navigable in fact when they are used or have been used in the past, or are susceptible of being used in the future, in their ordinary or improved condition (provided need and cost justify its improvement) as highways for commerce or transportation over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The true criterion is capability of use, however difficult, by the public for purposes of transportation and commerce, and the mode by which transportation or commerce is conducted is of no import, whether by steamer, sailing vessel or canoe. The waterway may be artificial if all other basic criteria are met. Waters constitute navigable waters of the United States in contradistinction from the navigable waters of the states, when they form in their ordinary or improved condition by themselves or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries."

■ Although the rule on navigability has been at times liberalized, to our knowledge none of the authoritative cases has liberalized the rule so as to indicate that mere pleasure fishing on a stream of water is such usage as would constitute navigability. The difficult problem is alway application of the particular facts in each case. In the instant case, it is simplified by petitioners' candor in limiting the problem to engagement in float fishing as being the only commerce upon the river. There is no record evidence of past history or no suggestion of practicability in liberalizing the rule to hold that mere pleasure fishing (and that is what float fishing is) constitutes a stream navigable in fact when it always has been susceptible for use only for this purpose. We do not think float or any other kind of fishing suffices when it is the sole ingredient to constitute navigability of a stream. If that be so, there are literally hundreds of overflow lands, drainage ditches, etc. where fishing is prevalent and useful for no other purpose which would be subject to admiralty jurisdiction. In the early case of Harrison v. Fite, 148 F. 781 (8th Cir. 1906), this court stated at page 783:

"To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs."

Harrison was cited with approval in our later case of Gratz v. McKee, 270 F. 713, 716 (8th Cir. 1920), aff'd 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167; 23 A.L.R. 1393, where we also noted a number of cases constituting the "great weight of authority" holding that in order to be navigable waters must be capable of practical general uses. The above quotation from Harrison is still sound and viable when applied to a fact situation such as we have here.

The Supreme Court in United States v. State of Utah, supra, supplies the condition that the stream must afford "a channel for useful commerce." We do not view the evidence as sufficing to indicate the existence of a channel for useful commerce or even to indicate that such a channel could be created with reasonable expenditures.

The Supreme Court of California in Bolsa Land Co. v. Burdict, 151 Cal. 254, 90 P. 532, 535, 12 L.R.A.,N.S., 275 (1907), observed:

"Though the belief seems to be somewhat widely held, it is not true that wherever one may catch fish the waters are navigable, or that wherever one may row or pole a boat he has the right so to do because of the navigability of the water."

■ The district judge was personally familiar with the river and noted in his opinion the great number of eminent domain cases resulting from the construction of the dam which reflect the opinion of the Corps of Engineers that the stream was nonnavigable. This, of course, is not dispositive of the issue but is not without significance. As stated by the Supreme Court in United States v. State of Oregon, 295 U.S. 1 at 23, 55 S. Ct. 610, 619, 79 L.Ed. 1267 (1935): "It is not without significance that the disputed area has been treated as nonnavigable both by the Secretary of the Interior and the Oregon courts."

We have mentioned the trend toward liberality in the treatment of admiralty jurisdiction but we are wary of unnecessary extension of any rule on navigability, particularly when it could well lead to absurdity. There are many fishing streams throughout the country which are not usable as highways for commerce or transportation in the customary mode. Float fishing on a stream does not render the stream navigable in fact, and the judgment of the district court is affirmed.