Jane O. LIVINGSTON, Administratrix of the Estate of Haldon C. Livingston, Deceased, Appellee,

v.

UNITED STATES of America, Appellant.

No. 79–1877.

United States Court of Appeals, Eighth Circuit.

Submitted May 23, 1980.

Decided Aug. 13, 1980.

Marc Richman, Atty., App. Staff, Civil Division, Dept. of Justice, Washington, D. C., argued, Alice Daniel, Asst. Atty. Gen., Washington, D. C., Larry R. McCord, U. S. Atty., Fort Smith, Ark., Leonard Schaitman, Marc Richman, Thomas L. Jones and Thomas W. Snook, Washington, D. C., on brief, for appellant.

Sidney S. McMath, Little Rock, Ark., argued, Sidney S. McMath, Little Rock, Ark., and Irene J. Barnes, Washington, D. C., on brief, for appellee.

Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

The United States brings this appeal from a judgment of the district court, sitting in admiralty. The district court found the United States eighty percent responsible for a boating accident that resulted in the death of Haldon Livingston, and it awarded damages of $192,800 to Livingston's estate. On appeal, the United States argues chiefly that the district court lacked admiralty jurisdiction because the accident occurred on waters that, though once used for commercial shipping, are no longer navigable in fact. We agree that admiralty jurisdiction was improperly invoked in this case and therefore reverse.

## I. Background.

### A. The Accident.

Haldon Livingston, appellee's decedent, drowned in the Norfork River in north central Arkansas on June 13, 1974, while fishing downstream from the Norfork hydroelectric dam. Mr. Livingston was forty-four years old. The United States, through the Army Corps of Engineers, owns the dam, the river, and both banks in the area of the accident.

The Livingstons and their friends, the Emens, had been staying at a public campsite on the banks of the Norfork for several days prior to the accident. They had rented a flat-bottomed fishing boat approximately sixteen feet long and had attached to it a small outboard motor. On the evening of the accident, Haldon Livingston, together with his twelve-year-old daughter, Margaret, and fourteen-year-old Jimmy Emens, decided to motor upstream to do some more fishing. Approximately 300 feet upstream from their campsite, opposite a boat ramp maintained by the Corps of Engineers, they passed a pole in the middle of the stream. Some thirty feet beyond this pole, Mr. Livingston shut off the motor and the boat began to float downstream. At that time, because the dam's generators had been running, the river was about 200 feet wide and 4 feet deep, with a 4 m.p.h. current.

Before Mr. Livingston or his passengers could cast their fishing lines, the bow of their boat struck a one-inch diameter steel cable. The cable was attached to the top of a twelve-foot post on the east bank of the river and angled downstream into the river about twenty feet from the bank, where it became lodged in the riverbed. The boat slipped beneath the cable and, under the force of the current, it began to submerge. The two children were able to get around the cable as the boat went under it. Somehow, though, Mr. Livingston became wedged between the cable and the back or

seat of the boat, and both he and the boat were forced down to the bottom of the river. The children managed to swim to the east bank. Attempts of bystanders to rescue Mr. Livingston were unavailing.

The post on the east bank and the cable were remnants of a temporary bridge built in the 1940's by the prime contractor building the dam. The prime contractor removed the bridge in 1945, when the dam was completed, but left the post on the east bank and the cable. Neither served any useful purpose thereafter. The pole in the middle of the river near the accident had been placed there in 1945 to hold a sign warning boaters not to go further upstream because of construction. This sign disappeared in 1947 and was never replaced. There was thus no sign warning boaters about the cable, even though (as the appellee proved) the Corps of Engineers knew of at least one prior boating mishap involving the cable. While the cable was visible, the district court found that both it and the post on the east bank could be easily overlooked.

### B. The Proceedings in the District Court.

Mrs. Livingston, as administratrix of her husband's estate, brought two wrongful death actions against the United States. One action invoked the court's admiralty jurisdiction under 28 U.S.C. § 1333(1) (1976) and claimed liability under 46 U.S.C. § 742 (1976); the other action sought relief under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671–2680 (1976). These actions were consolidated for trial.

In her FTCA action Mrs. Livingston alleged that, under applicable state law, the United States was liable as a landowner for its negligence towards her husband.[1] The district court held, however, that Mrs. Livingston had failed to prove what it determined to be the requisite degree of negli-

---

1. State law provides standards for assessing federal liability under the FTCA. 28 U.S.C. § 2674 (1976) provides in part:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances[.]

gence—*viz.*, willful or malicious failure to guard or to warn against a dangerous condition. Mrs. Livingston has not appealed this holding. Thus, only the district court's judgment in the admiralty action is before us on appeal.

Mrs. Livingston's admiralty action, unlike her FTCA claim, necessarily proceeds upon the assumption that the Norfork River is navigable.[2] The district court, addressing this jurisdictional question at the outset of its analysis, determined that the Norfork must be considered currently navigable in light of its historic commercial uses. The district court proceeded to find on the merits that the failure of the United States to guard or warn against the cable, when it knew of the dangers the cable posed to those using the river, constituted a breach of its duty to use ordinary care. The court found further that Mr. Livingston's negligence was small compared to that of the United States. Accordingly, the court concluded that his estate should have damages.

### C. *The Norfork River: A Historic and Geographical Sketch.*

In its natural state, the Norfork River was a small stream approximately 115 miles long, running south from Howell County, Missouri, to Norfork, Arkansas. There the Norfork empties into the White River, which in turn flows into the Mississippi.

Throughout the nineteenth century, settlers floated mineral products, fur pelts, and logs down the Norfork to its confluence with the White River. These products were then loaded onto barges or steamboats for transportation to the Mississippi River. After the arrival of the railroad in 1907, the settlement at the mouth of the Norfork

began to thrive as logging flourished. Logging was carried on along the banks of the Norfork as far upstream as Hudson Mill, Missouri. Loggers who had gone upstream built rafts of logs twenty feet wide and up to a quarter-mile long, to be floated downstream when the fall and spring rains came.

The district court found that this logging traffic was neither insignificant nor spasmodic. Between 1900 and 1930, several rafts of logs came into the settlement of Norfork every week when the river was high enough. Farmers in the area also used the Norfork commercially. In the summer months they harvested mussel shells some twenty miles upstream from Norfork and loaded them into large flat-bottomed boats. When full, these boats were floated down to Norfork, and the mussels were then shipped by railroad to a button factory in Batesville, Arkansas. Trapping upstream along the Norfork remained a lucrative business for farmers during the winter.

By 1941, however, the only traffic on the Norfork consisted of fishermen and their guides, plus an occasional raft of logs. Arrival of the automobile, improvement of local roads, extension of railroad service, and diminished demand for and supply of traditional products all conspired to decimate commercial activity on the Norfork. Indeed, the Army Corps of Engineers issued a report in 1933 declaring the Norfork River nonnavigable. Notwithstanding this report, the district court found that there was sufficient evidence of historic commercial use of the river to consider it navigable when construction of the dam on the Norfork began in 1941.

The dam has greatly changed the character of the Norfork River. Above the dam now is Lake Norfork; below, what remains

---

**2.** 28 U.S.C. § 1333 (1976) provides, in pertinent part:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction[.]

In *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), the Supreme Court explained that federal admiral-

ty and maritime jurisdiction extends to all public navigable lakes and rivers where commerce is carried on between different states or with a foreign nation. Hence, admiralty jurisdiction depends in the first instance upon the navigable character of the body of water in question—*i. e.*, whether it is in fact navigable in interstate or foreign water commerce. *See id.* at 457, 13 L.Ed. 1058; G. Gilmore and C. Black, *The Law of Admiralty* 31–33 (2d ed. 1975).

of the Norfork River runs for about three and one-half miles to the White River. The dam completely blocks travel between the river and the lake. When the dam's generators are not running, the river is very shallow, making it impossible to travel by boat without portaging in some areas. The river does rise substantially when the generators are running. Nonetheless, traffic on the river now consists almost exclusively of small skiffs used for recreational fishing.

## II. *Analysis.*

In relying upon its history of commercial use to establish the present navigability of the Norfork River, the district court acted in accordance with language found in two decisions of this court suggesting that a river once navigable is always so. In *George v. Beavark, Inc.*, 402 F.2d 977, 978 (8th Cir. 1968), we stated that "[i]f the river was navigable prior to construction of the dam, it continues to be considered as a navigable stream." [3] And in *Loc-Wood Boat & Motors v. Rockwell*, 245 F.2d 306 (8th Cir. 1957), this court sustained the assertion of federal admiralty jurisdiction over a tort occurring on the Lake of the Ozarks, a lake wholly within Missouri formed by the damming of the Osage River.

The district court in that case had found the lake navigable because of the historic navigability of the Osage River and the continuing authority of federal agencies over vessels plying the lake. *In re Wood's Petition*, 145 F.Supp. 848, 854 (W.D.Mo.1956).

In neither *George v. Beavark, Inc.* nor *Loc-Wood Boat & Motors*, however, was this court squarely faced with the question of whether current navigability in fact is required for admiralty jurisdiction.[4] Moreover, there are indications in an earlier decision by this court that current navigability might well be required. In *Harrison v. Fite*, 148 F. 781 (8th Cir. 1906), a case addressing the right of the public to use an old riverbed, the court stated:

To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. * * *

It does not follow that, because a stream or body of water was once navigable, it has since continued and remains so. Changes may occur * * * that work a destruction of capacity and utility as a means of transportation; and, when this

**3.** This statement underlies the district court's focus upon the navigability of the Norfork in 1941.

**4.** The sole issue on appeal, the court noted in *George v. Beavark, Inc., supra*, 402 F.2d at 978, was whether "float fishing" constituted sufficient commerce and transportation to warrant calling a stream navigable. The court determined that it did not and affirmed the district court's dismissal of the action for want of jurisdiction. Thus, the statement quoted in the text at note 3, *supra*, is dictum.

In *Loc-Wood Boat & Motors, supra*, the owners of a boat that had sunk sought exoneration from, or limitation of, their liability to the passengers. *See* 46 U.S.C. § 183(a) (1976). The district court, having determined that it had admiralty jurisdiction, made findings of "privity or knowledge" under § 183(a) that rendered the owners fully liable for the deaths and injuries suffered by the passengers. These findings were upheld on appeal. No party before the appellate court questioned the appropriateness of admiralty jurisdiction. A court may, of course, examine the jurisdictional basis of an action on its own motion. *See City of Kenosha*

*v. Bruno*, 412 U.S. 507, 511, 93 S.Ct. 2222, 2225, 37 L.Ed.2d 109 (1973). In *Loc-Wood*, the court said only that "[t]he lake is entirely within the state of Missouri, but is navigable water within the admiralty and maritime jurisdiction of the United States." *Loc-Wood Boat & Motors, supra*, 245 F.2d at 307 (citations omitted). The court supplied no reasons for this conclusion, and specifically said nothing about historic navigability.

*George v. Beavark, Inc.* and *Loc-Wood Boat & Motors* have been relied upon to establish admiralty jurisdiction over man–made lakes in two other district court decisions in this circuit. *Free v. Sample*, 324 F.Supp. 1362 (W.D.Ark. 1971); and *Cooper v. U. S.*, 489 F.Supp. 200 (W.D.Mo.1980). In the latter case, Judge Hunter, while following *Loc-Wood Boat & Motors*, strongly questioned its underlying reasoning. Elsewhere the rule thought to be established by these cases has been criticized by both courts and commentators. *Marine Office of Am. v. Manion*, 241 F.Supp. 621, 622 (D.Mass.1965); G. Gilmore and C. Black, *The Law of Admiralty* 33 n.103 (2d ed. 1975).

result may fairly be said to be permanent, a stream or lake in such condition should cease to be classed among those waters that are charged with a public use. [*Id.* at 783–84.]

The district court determined that *Harrison v. Fite* was no longer good law on the issue of current navigability because of intervening cases such as *United States v. Appalachian Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). In that case, the Supreme Court upheld the authority of Congress under the commerce clause to require federal licensing of a hydroelectric dam on a previously navigable stream. The Court indicated that a waterway capable of being made navigable in interstate commerce is a navigable water coming within the power of Congress; likewise, a waterway once determined to be navigable remains so.[5] *Id.* at 407–08, 61 S.Ct. at 299.

Clearly, the categorical statements contained in *Harrison v. Fite* do not apply to assertions of congressional authority under the commerce clause. It does not follow, however, that they have no vitality. The Supreme Court has recently observed that precedent in this area must be evaluated carefully in light of " 'the *purpose* for which the concept of "navigability" was invoked in a particular case.' " *Kaiser Aetna v. United States*, 444 U.S. 164, 171, 100 S.Ct. 383, 388, 62 L.Ed.2d 332 (1979) (quoting with approval from the district court opinion, 408 F.Supp. 42, 49 (D.C.Haw.) (emphasis in original)). The Court in that case identified four separate purposes underlying definitions of "navigability": to delimit the boundaries of the navigational servitude; to define the scope of Congress' regulatory authority under the commerce clause; to determine the extent of the authority of the Corps of Engineers under the

Rivers and Harbors Act of 1899; and to establish the limits of federal admiralty jurisdiction. Each of these areas of the law might well require a different definition of "navigability."

In *Kaiser Aetna*, the Court noted specifically that Congress' regulatory authority under the commerce clause is historically very broad, and the expansive definitions of navigability developed in commerce clause cases are not really appropriate in other contexts where the actual capability of a stream to support navigation is critical. *See id.* 100 S.Ct. at 389–90. What is required in those contexts is a functional analysis of "navigability," so that the limits of governmental authority are determined in accordance with the purposes it serves. In the case at hand, such an analysis indicates that federal admiralty jurisdiction should not be extended to Mr. Livingston's accident in the Norfork River.

 Federal admiralty jurisdiction had its genesis in the felt need to provide a uniform body of law governing navigation and commercial maritime activity. Admiralty law, as a consequence, is concerned almost exclusively with the special needs of the shipping industry. *See Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 269–70, 93 S.Ct. 493, 504–05, 34 L.Ed.2d 454 (1972); G. Gilmore and C. Black, *The Law of Admiralty* 1, 11–12 (2d ed. 1975). Extensions of admiralty jurisdiction have followed the opening of new waters to commercial shipping. *See The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 453–54, 13 L.Ed. 1058 (1851). In our view, the closing of waters to commercial shipping should likewise have the effect of eliminating admiralty jurisdiction over them.[6] In other words, the concept of

---

**5.** The Court cited for this proposition *Economy Light Co. v. U. S.*, 256 U.S. 1113, 41 S.Ct. 409, 65 L.Ed. 847 (1921), another damming case that arose under the Rivers and Harbors Act of 1899. This court relied upon both cases for the dictum in *George v. Beavark, Inc., supra*, that construction of a dam does not alter a river's navigability.

**6.** This view is supported by the Supreme Court's recent statement that the exercise of admiralty tort jurisdiction requires not only the presence of navigable waters, but also a significant relationship between the asserted wrong and traditional maritime activity, such as shipping. *Executive Jet Aviation v. City of Cleveland, supra*, 409 U.S. at 261, 93 S.Ct. at 501. *See Duluth Superior Excursions v. Makela*, 623 F.2d 1251 (8th Cir. 1980); *St. Hilaire Moye v.*

"navigability" in admiralty is properly limited to describing a present capability of waters to sustain commercial shipping.

Both the Ninth Circuit and the Seventh Circuit, addressing the precise question before us, have reached the same conclusion. In *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir. 1975), the court held that a dam-obstructed portion of the Missouri River no longer traversed by commercial maritime shipping was not navigable for purposes of admiralty jurisdiction, even though it would be considered navigable under the commerce clause. The court observed that, absent some present or potential commercial activity, there is no ascertainable federal interest that justifies frustrating the legitimate interests of the states in providing a forum and applying their law to regulate conduct within their borders. *Id.* at 439. In *Chapman v. United States*, 575 F.2d 147 (7th Cir.) (*en banc*), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978), the court expressly adopted the reasoning in *Adams*, holding that federal admiralty jurisdiction did not encompass a claim brought by the estate of a man who drowned in a river last used for commercial shipping in 1931.

 In the case at hand, there is no dispute that commercial activity on the Norfork River ceased after construction of the hydroelectric dam in 1941–43.[7] The history of commercial traffic on the river, whatever its intrinsic interest, does not determine the scope of present-day admiralty jurisdiction. Notwithstanding any expressions to the contrary in prior decisions of this court, federal admiralty jurisdiction turns on contemporary navigability in fact. Because Mrs. Livingston failed to satisfy this test in the present case, her admiralty action should have been dismissed for want of jurisdiction. *See* Fed.R.Civ.P. 12(h)(3).

*Henderson*, 496 F.2d 973, 979 (8th Cir.), *cert. denied*, 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974) (upholding the exercise of admiralty jurisdiction over the operation of pleasure boats that present potential dangers to actual commerce). The disappearance of traditional

The judgment of the district court is reversed, and the case is remanded for entry of a judgment dismissing this admiralty action for want of jurisdiction.

maritime activity destroys the very possibility of such a nexus.

7. This court has held that pleasure fishing alone is insufficient to render a stream navigable for purposes of admiralty jurisdiction. *George v. Beavark, Inc., supra*, 402 F.2d at 981.