Revised February 17, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-60625

_____

CARL BIENVENU,

Petitioner,

versus

TEXACO, INC; DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS,
U.S. DEPARTMENT OF LABOR; INSURANCE COMPANY OF NORTH AMERICA,

Respondents.

_____

Petition for Review of an Order of the
Benefits Review Board
_____

January 11, 1999

Before POLITZ, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES,
SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES,
STEWART, PARKER, and DENNIS, Circuit Judges.[*]

HIGGINBOTHAM and DAVIS, Circuit Judges:

Carl Bienvenu seeks benefits under the Longshore and Harbor

Workers' Compensation Act (LHWCA) for injuries sustained on

navigable waters during the course of his employment. His petition

requires us to enter the unsettled waters of our LHWCA

jurisprudence. In deciding that Bienvenu is entitled to LHWCA

_____

[*]Judges King and Duhe' are recused.

benefits, we right our wayward precedent and chart a smoother course for future panels to follow.

## I.

Bienvenu worked for Texaco, Inc., in the Caillou Island production field as a pumper specialist. By 1987 he had been employed by Texaco in this field for about twenty-two years. The Caillou Island production field is a five-mile by twelve-mile area located within three miles of the Louisiana coast and contains approximately 150 to 175 active fixed production platforms. Bienvenu and his fellow employees lived in a base camp on pilings over the water. Bienvenu worked seven days on and seven days off, and on his work days he worked a twelve-hour shift. Bienvenu was responsible for maintaining and calibrating automated equipment located on fixed production platforms. Bienvenu had the almost exclusive use of a vessel, the MISS JACKIE, along with a skipper to transport him around the field to the platforms where he worked. The ALJ found that during an average twelve-hour work day, Bienvenu spent approximately 75% of his time performing his duties while physically located on a fixed production platform; 16.7% of his time in transit as a passenger on the MISS JACKIE; and 8.3% of his time working on equipment on the back of the MISS JACKIE.

Bienvenu was injured twice during the course of his employment while on board the MISS JACKIE in navigable waters. The first time was while moving his tool box from the dock to the boat, and the

2

second time was while tying the MISS JACKIE to the dock. These injuries forced him to stop working.

Bienvenu claimed benefits under the LHWCA. An ALJ denied Bienvenu relief on the grounds that the LHWCA did not apply to him since he was not engaged in "maritime employment." The ALJ read this Court's prior decisions to mean that coverage under the Act was dictated by the "amount of time devoted to specific work activity by a Claimant." The ALJ ruled that Bienvenu was not a "maritime employee" because he spent the vast majority of his working hours on fixed platforms and was only fortuitously on navigable waters when injured. The extension of the LHWCA to land-based activities did not apply to Bienvenu since his work was not an integral or essential part of loading or unloading a vessel.

Bienvenu timely appealed the ALJ's decision to the Benefits Review Board ("BRB"). The BRB failed to render a timely decision and was deemed to have affirmed the ALJ's ruling. See Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-219. Bienvenu petitioned us for review. A panel of this court reversed the ALJ's decision because Fifth Circuit precedent compelled a conclusion that Bienvenu passed the status test since he was on navigable waters when injured. Bienvenu v. Texaco, Inc., 124 F.3d 692, 692-93 (5th Cir.), reh'g en banc granted, 131 F.3d 1135 (5th Cir. 1997).

II

3

In 1917, the Supreme Court held that state workers' compensation systems could not reach longshoremen injured seaward of the water's edge. Southern Pac. Co. v. Jensen, 244 U.S. 205 (1917). In response, Congress passed the LHWCA in 1927. See Pub. L. No. 803, 44 Stat. 1429. Technically, there were five requirements for coverage under the LHWCA as originally enacted, as later detailed by the Supreme Court in Director v. Perini North River Associates, 459 U.S. 297, 306-07 (1983):

(1) The employee could not be a "master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under 18 tons net."

(2) The employee must suffer injury during the course of employment.

(3) The employee had to be employed by a statutory "employer," defined to be "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States."

(4) The employee had to meet a situs requirement that injury occurred upon navigable waters.

(5) No federal coverage unless compensation may not validly be provided by state law.[1]

---

[1] "Congress used [this phrase] . . . in a sense consistent with the delineation of coverage as reaching injuries occurring on navigable waters." Id. at 309 (quoting Calbeck v. Travelers Ins. Co., 370 U.S. 114, 126 (1962)). The phrase was deleted in 1972. See id. at 313-14.

In 1969, the Supreme Court, while recognizing the harshness of the Jensen line, held that the LHWCA did not extend to injuries occurring on a pier attached to land. Nacirema Operating Co. v. Johnson, 396 U.S. 212, 218-20 (1969). The Court stated that the "invitation to move that line landward must be addressed to Congress, not to this Court." Id. at 224. Congress acted on this invitation in 1972 when it amended the LHWCA. See LHWCA Amendments of 1972, Pub. L. No. 92-576, 86 Stat. 1251. The 1972 Amendments extended "coverage to more workers by replacing the single-situs requirement with a two-part situs and status standard." P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 73 (1979). The situs test now reached shoreward to reach injuries "occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.)" 33 U.S.C. § 903(a). The status test defined an employee as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and ship-breaker." Id. § 902(3).

In Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249 (1977), the Supreme Court first expounded on the status test. The workers in that case were Blundo and Caputo. Blundo was injured when he fell while checking cargo as it was removed from a

5

container.  Caputo moved cargo from the hold of the vessel onto shore and was hurt when rolling a dolly into a truck.  Though the 1972 Act did not expressly state that workers in their positions were covered, the Court held that both Blundo and Caputo were entitled to benefits.  Blundo was covered because "[o]ne of the reasons Congress expanded coverage in 1972 was that containerization permits loading and unloading tasks traditionally conducted aboard ship to be performed on the land."  Pfeiffer, 444 U.S. at 74.  Caputo fell under the LHWCA because he spent some of his time in "indisputably longshoring operations,"Caputo, 432 U.S. at 273, and Congress had intended "to ensure that a worker who could have been covered part of the time by the pre-1972 Act would be completely covered by the 1972 Act."  Pfeiffer, 444 U.S. at 75.

In Pfeiffer, the Supreme Court further elaborated on the difference between the situs and status tests by noting that the situs test limits the geographic coverage of the LHWCA, while the status test is an occupational concept that focuses on the nature of the worker's activities.  Id. at 78.  The "crucial factor" in determining the scope of maritime employment "is the nature of the activity to which a worker may be assigned."  Id. at 82.  Though the 1972 Amendments extend coverage, they do not provide benefits to all workers in the situs area, such as truck drivers who pick up goods for further trans-shipment.  Id. at 83.

Four years after Pfeiffer, the Supreme Court returned to this issue in Perini.  In that case, a workman, Churchill, was employed

6

in the construction of a sewage treatment plant that extended over the Hudson River. He was injured on the deck of a cargo barge where he was supervising operations. The Court found no congressional intent in the 1972 Amendments to withdraw LHWCA coverage from workmen covered by the Act before 1972. The Court held that when a worker is injured on the actual navigable waters in the course of his employment on these waters, he satisfies the status requirement, assuming that the other requirements of the LHWCA are met. 459 U.S. at 324 & n.33. The Court expressed no opinion on whether LHWCA coverage extends to a worker "injured while transiently or fortuitously upon actual navigable waters or to a land-based worker injured on land who then falls into actual navigable waters." Id. at 324 n.34.

The Perini Court discussed three of its pre-1972 cases to illustrate the scope of the Act's coverage before the amendments were adopted. See id. at 307-12 (discussing Davis v. Department of Labor, 317 U.S. 249 (1942); Parker v. Motor Boat Sales, 314 U.S. 244 (1941); and Calbeck v. Travelers Ins. Co., 370 U.S. 114 (1962)). Parker is the case most relevant to our decision.[2]

In Parker, Mr. Armistead, a janitor employed by a retailer of pleasure craft, was directed to assist a salesman place outboard

---

[2] The employee in Davis was injured while standing on a barge and dismantling a bridge. In Calbeck, the employee was completing construction of a vessel afloat on navigable waters. Thus, the job responsibilities of the employees in those cases required more frequent work on navigable waters than those of the employee in Parker.

7

motors on a boat. Mr. Cooper, the salesman, then allowed Mr. Armistead to accompany him as he demonstrated the motor on the customer's boat. During the demonstration run, the vessel capsized and Armistead was killed. The Court first reviewed the evidence to determine whether the evidence was sufficient to support the deputy commissioner's finding that Armistead was acting within the course of his employment. The Court found the following portions of the record pertinent to this inquiry:

> that on the morning of the accident Armistead was sent to the river with specific instructions to help Cooper in placing the outboard motors on the boat; that there were no specific instructions as to whether or not Armistead was to stay out of the boat; that either Armistead or Cooper was told that Armistead was 'to go and help' Cooper; that Cooper, the superior of the two employees, at least acquiesced in Armistead's remaining in the boat to 'keep a lookout' for hidden objects in the muddy water; that Cooper regarded Armistead's acting as look out as 'helpful'; that employees of the respondent would sometimes make trips in boats for testing purposes, in furtherance of respondent's business; and that in one such instance an employee had taken a boat on a trip of at least fifty miles in respondent's behalf.[3]

314 U.S. at 246.

The Court concluded that, based on the above evidence, the deputy commissioner and the district court correctly found that

---

[3] According to the Court of Appeals' opinion in Parker, the day of Armistead's accident, as far as the record discloses, was the only instance when his duties ever brought him into contact with navigable waters. Motor Boat Sales, Inc. v. Parker, 116 F.2d 789, 792 (4th Cir.), rev'd, 314 U.S. 244 (1941). Unlike the worker in Green v. Vermilion Corp., 144 F.3d 332 (5th Cir. 1998), Bienvenu was not engaged in traditional longshoreman duties aboard the vessel when the injuries occurred.

Armistead was covered under the LHWCA. The Court stated that coverage would not be denied because

> habitual performance of other and different duties on land cannot alter the fact that at the time of the accident he was riding in a boat on a navigable river, and it is in connection with that clearly maritime activity that the award was here made. Moreover, § 2(4) of the Act, 33 U.S.C.A. § 902(4), expressly provides for its application to 'employees (who) are employed . . . in whole or in part upon the navigable waters of the United States.

Id. at 247 (footnote and citations omitted) (alterations in original).

The Perini Court cited with approval Pennsylvania R. Co. v. O'Rourke, 344 U.S. 334 (1953), which considered whether a railroad worker injured on navigable water was covered by the LHWCA. The claimant's five-man train crew had duties that included work on the railroad company's car floats, which moved freight and passengers to and from the yard by water. At the time of the accident, the crew was removing boxcars from floats. O'Rourke climbed up on a boxcar to release a brake and fell. The question presented was whether O'Rourke could bring a damage action under the Federal Employers' Liability Act (FELA) or was relegated to a compensation remedy under the LHWCA. The Court of Appeals held that the claimant was not covered under the LHWCA because he was a railroad worker and was not engaged in maritime employment. O'Rourke v. Pennsylvania R. Co., 194 F.2d 612, 615 (2d Cir. 1952), rev'd, 344 U.S. 344 (1953).

In reversing the Court of Appeals, the Supreme Court stated:

9

We are clear, however, that the emphasis on the nature of respondent's duties here misses the mark. The statute applies, by its own terms, to accidents on navigable waters when the employer has any employees engaged in maritime service. . . . The Court of Appeals, we think, is in error in holding that the statute requires as to the employee, both injury on navigable water and maritime employment as a ground for coverage by the Compensation Act. An injured worker's particular activity at the time of injury determines of course whether he was injured in the course of his employment within § 902(2), and whether he was a member of the crew of the vessel within the exceptions of §§ 902(3) and 903(a)(1). This explains the emphasis on the factor of the individual's job in <u>Parker v. Motor Boat Sales, Inc.</u> . . . ."

344 U.S. at 340.

The Court had the following to say about <u>Parker</u>.

The result in <u>Parker</u>, as well, is totally inconsistent with any 'duties test.' Armistead, the employee there, was a janitor with the motor boat company. He had been ordered to ride in one of the boats during a test trip in order to keep a lookout for hidden objects. Compensation under the Harbor Workers Act could not have been paid in connection with his death if we were to test its applicability by the nature of his regular work.

<u>Id</u>. at 341 (citation omitted).

In 1985, the Supreme Court considered whether a welder employed on a platform in Louisiana waters was covered under the LHWCA. <u>Herb's Welding, Inc. v. Gray</u>, 470 U.S. 414 (1985). The Court held that because Gray, the welder, was not injured on navigable waters he could attain coverage only by qualifying for the 1972 Amendments' expanded coverage for shore side workers. The court concluded that Gray did not qualify for this expanded coverage because he was not engaged in "maritime employment." This employment was limited to longshoring, shipbuilding and ship

10

repairing. Gray's welding work on stationary platforms did not fit within this definition. See id. at 424-26.

The Court made clear, however, that this definition of maritime employment did not apply to workers injured on navigable waters: "This view of 'maritime employment' does not preclude benefits for those whose injury would have been covered before 1972 because it occurred 'on navigable waters'." Id. at 424 n.10.

The Court also discussed the Court of Appeals' position that because Gray would be covered while traveling by boat to work on the platform, a finding of no coverage while Gray was on the platform created a "curious hole" in coverage.

> Gray traveled between platforms by boat and might have been covered, before or after 1972, had he been injured while in transit. See Director, OWCP v. Perini North River Assoc., 459 U.S. at 324, 103 S.Ct. at 651. But see id., at 324, n. 34, 103 S.Ct. at 651, n. 34. ("We express no opinion whether such coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters."). . . . Any coverage attributable to the LHWCA itself was de minimis. We also note in passing a substantial difference between a worker performing a set of tasks requiring him to be both on and off navigable waters, and a worker whose job is entirely land-based but who takes a boat to work.

Id. at 427 n.13.

With this general background, we now turn to the arguments of the parties in this case.

### III.

#### A.

In light of Bienvenu's injury on navigable waters, Texaco acknowledges, as it must, that Bienvenu need not establish that he

11

was engaged in maritime employment as that term is used in § 2(3) of the Act. The Supreme Court's decisions in Perini and Herb's Welding foreclose this argument. Those cases recognize that the 1972 Amendments were not intended to alter the scope of coverage for workmen injured on navigable waters. As our discussion above demonstrates, before 1972, any workman injured in the course of his employment actually engaged in the performance of his assigned duties on navigable waters enjoyed coverage under the LHWCA. He was not required to perform the traditional maritime work described in § 2(3) of the Act.

Relying on language in Perini, Texaco argues that workers like Bienvenu who are injured on navigable waters must establish that they were "required to perform their employment duties on navigable waters."

Texaco argues that the one hour per day Bienvenu spent on the deck of the MISS JACKIE, working on compressors and other platform equipment, could have been performed on the platform had Bienvenu chosen to do so and therefore that this work does not bring him within the LHWCA coverage. We disagree with this reading of Perini. The Perini Court, in discussing the pre-1972 law relative to coverage under the Act, stated: "It becomes clear from this discussion that the 1927 Act, as interpreted by Parker, Davis, and Calbeck, provided coverage to those employees of statutory 'employers,' injured while working upon navigable waters in the course of their employment." 459 U.S. at 311. In the very same

12

paragraph the Court cites with approval the following quote from Gilmore and Black: "Any worker injured upon navigable waters in the course of employment was 'covered' . . . without any inquiry into what he was doing (or supposed to be doing) at the time of his injury." Id. at 311 (citation omitted) (alteration in original).

Immediately following this discussion the Court uses the language upon which Texaco relies: "As a marine construction worker required to work upon navigable waters, and injured while performing his duties on navigable waters, there can be no doubt that Churchill would have been covered under the 1927 LHWCA." Id. at 311-12.

We cannot read the above sentence as demanding that a worker demonstrate that the duties he was performing aboard the vessel were in response to a direct order from his superior. We believe that all Perini requires is that the claimant show that he was injured on navigable waters while in the course of his employment.[4]

---

[4] Two other passages from Perini buttress this conclusion:

> We are unable to find any congressional intent to withdraw coverage of the LHWCA from those workers injured on navigable waters in the course of their employment and who would have been covered by the Act before 1972.

Id. at 315.

> There is nothing in these comments or anywhere else in the legislative reports, to suggest, as Perini claims, that Congress intended the status language to require that an employee injured upon the navigable waters in the course of his employment had to show that his employment possessed a direct (or substantial) relation to navigation or commerce in order to be covered.

13

In this case, the ALJ found that Bienvenu spent one hour out of a twelve-hour workday, or approximately 8.3% of his work time, actually performing job responsibilities on navigable waters. From the record, it is clear that Bienvenu had been performing the same work from the MISS JACKIE for about eleven years. Surely if Texaco had some objections to Bienvenu's working on platform equipment aboard the MISS JACKIE over this extended period of time it would have made them known. Under these circumstances, Bienvenu was entitled to assume that he had the discretion to perform his repair and maintenance work on production equipment at the location he deemed most efficient, including on the vessel. Bienvenu was in the course of his employment when he performed the above-described work on the MISS JACKIE and Bienvenu is covered under the LHWCA unless Texaco prevails on its argument that Bienvenu was aboard the MISS JACKIE fortuitously or transiently and for that reason has no coverage. We now turn to this argument.

B.

As we discussed above, the Supreme Court in Perini reserved the question of whether a workman aboard a vessel "transiently or fortuitously" enjoyed coverage under the LHWCA. The Court in Herb's Welding reiterated this reservation. 470 U.S. at 427 n.13.

The Director argues that while the Supreme Court reserved this question in Perini, the cases it cited as representative of the

Id. at 318-19.

14

pre-1972 law on coverage indicate that the Court would reject any such hole in coverage. While it is not free from doubt, we believe that the signals from the Supreme Court in <u>Perini</u> and again in <u>Herb's Welding</u> indicate that the Supreme Court would hold that a workman who is aboard a vessel simply transiently or fortuitously, even though technically in the course of his employment, does not enjoy coverage under the LHWCA. We join the Eleventh Circuit in reaching this conclusion. <u>See Brockington v. Certified Elec., Inc.</u>, 903 F.2d 1523, 1528 (11th Cir. 1990); <u>see also Zapata-Haynie Corp. v. Barnard</u>, 933 F.2d 256, 260 (4th Cir. 1991) (noting that the plaintiff was "not merely fortuitously over water when his injury occurred").

We therefore hold that a worker injured in the course of his employment on navigable waters is engaged in maritime employment and meets the status test[5] only if his presence on the water at the time of injury was neither transient or fortuitous. The presence, however, of a worker injured on the water and who performs a "not insubstantial" amount of his work on navigable waters is neither transient nor fortuitous. Though we decline to set today the exact amount of work performance on navigable waters sufficient to trigger LHWCA coverage, instead leaving that task to the case-by-case development for which the common law is so well-suited, <u>see</u>

---

[5] <u>See Perini</u>, 459 U.S. at 324 ("[W]hen a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement . . . .").

15

Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1073 (5th Cir. 1986) (en banc) (adopting case-by-case review to determine coverage under the Jones Act), we will provide some guiding thoughts on the matter.

First, the threshold amount must be greater than a modicum of activity in order to preclude coverage to those employees who are merely commuting from shore to work by boat. Also, the routine activity of assisting in tying the vessel to the dock and loading or unloading one's tools and personal gear onto the vessel do not count as meaningful job responsibilities. Moreover, we agree with the Supreme Court in Herb's Welding that there is a substantial difference between a worker "performing a set of tasks requiring him to be both on and off navigable waters, and a worker whose job is entirely land based but who takes a boat to work." 470 U.S. at 427 n.13. The time Bienvenu actually worked on production equipment aboard the MISS JACKIE constituted 8.3% of his time at work. This is not an insubstantial amount of Bienvenu's work time and is sufficient to trigger LHWCA coverage.[6]

Our conclusion today that the Supreme Court would deny LHWCA coverage to a worker injured on a vessel that he is aboard

---

[6] Because Bienvenu's work on the production equipment aboard the MISS JACKIE is sufficient to trigger LHWCA coverage, we do not consider whether his time aboard the MISS JACKIE being shuttled from platform to platform should be included in determining whether he spent more than a modicum of his work time on navigable waters.

16

transiently or fortuitously permits us to clarify our case law on this subject.[7]

In Fontenot v. AWI, Inc., 923 F.2d 1127 (5th Cir. 1991), we held that a worker who spent 40% of his worktime on shore, 30% on fixed platforms and 30% on oil exploration and production vessels, was engaged in maritime employment because he "was injured while on actual navigable waters, in the course of his employment." Id. at 1130. Our holding today is entirely consistent with our holding in Fontenot given the substantial duties Fontenot had on navigable waters.

In Randall v. Chevron U.S.A., Inc., 13 F.3d 888 (5th Cir. 1994), the petitioner's husband was killed while attempting to transfer by swing rope from a fixed platform to a vessel. Mr. Randall was a mechanic who performed all of his work duties on a fixed platform and had no assigned duties on navigable waters. He was simply transported to and from his workstation--a stationary platform--by boat.

The Randall panel read Fontenot to base coverage under the LHWCA solely upon Fontenot's injury on navigable waters without regard to the extent of his duties on navigable waters. It therefore concluded that Fontenot had decided that workers injured

---

[7] Our decisions in Thibodaux v. Atlantic Richfield Co., 580 F.2d 841 (5th Cir. 1978), and Boudreaux v. American Workover, Inc., 680 F.2d 1034 (5th Cir. Unit A 1982) (en banc), were decided before the Supreme Court announced its decision in Director v. Perini and answered most of the questions confronting us at that time.

17

while transiently or fortuitously upon navigable waters are covered by the LHWCA.  See id. at 897.  Because the Randall panel found itself bound by what it perceived as this holding in Fontenot, the Randall panel concluded that the claimant was covered by the LHWCA. This court, sitting en banc, of course is not bound by either Fontenot or Randall.  As our discussion above indicates, our conclusion that workmen who are aboard vessels transiently or fortuitously when they sustain injury are not covered by the LHWCA is inconsistent with Randall's holding.  Randall is therefore overruled.

IV.

Judge DeMoss, in his dissent, argues that we ignored the 1984 Amendments to the LHWCA. We did not deal with the amendments, codified at 33 U.S.C. § 902(3)(A)-(F), for a reason: They have nothing to do with this case. The amendments exclude from coverage under the Act persons engaged in six separate, narrowly defined types of employment. These include: clerical workers (Section 902(3)(A)); workers at camps, restaurants, or retail outlets (Section 902(3)(B)); marina workers (Section 902(3)(C)); workers employed by vendors or suppliers (Section 902(3)(D)); aquaculture workers (Section 902(3)(E)); and builders or repairers of recreational vessels (Section 902(3)(F)). If a person who would otherwise be covered under the LHWCA does the type of work enumerated by one of these amendments and is covered by a state workman's compensation act, he is not covered by the LHWCA. But

18

Bienvenu's employment as a pumper/gauger does not fit within any of the job descriptions listed in the amendments.

Both Judge Jones and Judge DeMoss argue in dissent that unless a worker devotes substantial time to longshore duties (Judge DeMoss suggests 30%), he should not be covered under the LHWCA. Adoption of such a rule would create serious problems. First, such a rule is plainly inconsistent with <u>Perini</u> (worker injured on the navigable water in the course of his employment satisfies the status requirement). Indeed, Judge Jones's main point is that <u>Perini</u> was wrongly decided. Second, imposing such a blanket requirement would overrun the detailed provisions of the 1984 amendments. The very detailing of specific job descriptions by Congress belies <u>any</u> speculation that Congress intended by the amendments any such wholesale withdrawal of compensation coverage -- recall that the exclusions under the amendments demand coverage under state workers' compensation. The dissent is silent about workers beyond state territorial waters. Such workers to whom coverage under the LHWCA is not expressly extended by statute (such as the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 <u>et seq.</u>) presumably will be left without compensation.

Relatedly, Judge DeMoss argues that our opinion in this case conflicts with this Court's recent opinion in <u>Green v. Vermilion Corp</u>., 144 F.3d. 332 (5th Cir. 1998). In <u>Green</u>, we held that a worker in a hunting camp was not covered under the LHWCA. The distinction between the two cases is patent: Green was a "camp"

19

worker expressly excluded from coverage by Section 902 (3)(B); Bienvenu does not fall within any of Section 902's narrowly defined exclusions.

Judge DeMoss next takes the position that the Supreme Court's conclusion in Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S. Ct. 1421 (1985), that the oil field welder in that case was not engaged in maritime employment precludes Bienvenu's recovery under the LHWCA. He refuses to acknowledge the distinction between a worker injured on land and a worker injured on navigable water. The Court made it crystal clear that its denial of coverage to Gray was because he fell outside of the 1972 Amendments' expanded coverage for shore side workers. The Court expressly held: "This view of 'maritime employment' does not preclude benefits for those whose injury would have been covered before 1972 because it occurred 'on navigable waters.'" 470 U.S. at 424 n. 10, 105 S. Ct. at 1428 n. 10.

By arguing that workers injured on navigable water only qualify for LHWCA coverage if they perform longshore duties, Judges Jones and DeMoss fail to recognize the long established principle that persons engaged in work aboard vessels are engaged in maritime employment. See Gilmore & Black, The Law of Admiralty at 429-30. That principle underlies the Perini Court's conclusion that workers engaged in the course of their employment satisfy the "status" requirement. 459 U.S. at 311. Imposing such a duties test also directly conflicts with the Supreme Court's holding in Penn. R. Co.

20

v. O'Rourke, 344 U.S. 334 (1953) (see discussion in text, *supra*), which the Court relied on in Perini.  Also, the Dissents' proposed holding that oilfield work aboard a vessel is not maritime employment would mean that the hundreds of oilfield workers working on drilling barges are not maritime employees.  In The Offshore Co. v. Robison, 266 F.2d 769 (5th Cir. 1959), and the hundreds of cases that followed, we held that such workers qualify as seamen and can recover under the Jones Act and the General Maritime law.  The Dissenters' reasoning would lead to the anomalous holding that oilfield work aboard a vessel is not maritime work if the employee spends less than 30% of his time performing that work; yet a worker who performs more than 30% of his work aboard a vessel is a seaman, the highest form of maritime worker.  See Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) (stevedore elevated to status of seaman for purposes of suing shipowner for unseaworthiness).

The assertion that adopting an inquiry for longshoreman coverage similar to that for seaman status affords a more clear and litigation-dampening standard is both stunning and perverse.  It is stunning to those familiar with the huge number of cases spawned in our struggle with that test.  It is perverse to place the same hurdle before an injured worker who claims to be a seaman, with the uncapped liability system they enjoy, and an injured worker seeking workers' compensation as a longshoreman.  The "logic" of the

Dissents' equating what is essentially a tort system with a workers' compensation scheme turns the fundamental purpose of a no-liability, limited-damage compensation scheme upside down. Finally, an en banc court is not the Congress.

For the reasons stated above, the judgments of the BRB and ALJ are REVERSED and the case is REMANDED to the ALJ for further proceedings.

EDITH H. JONES, Circuit Judge, dissenting:

Even though I must agree with the majority opinion that we are bound by Perini's general interpretation of the 1972 amendments to the LHWCA, I disagree with their conclusion that Bienvenu, an oil pumper who spent his entire career maintaining oil and gas equipment on production platforms within Louisiana's three-mile limit, was not "transiently" injured on board the Miss Jackie. The majority's decision to the contrary sets such a low threshold for LHWCA coverage that it is easy to envision increased litigation over LHWCA coverage for other land-based workers who are maritime commuters. Of course, as the Supreme Court said, "there will always be a boundary to coverage, and there will always be people who cross it during their employment." Herb's Welding, Inc. v. Gray, 470 U.S. 414, 428, 105 S. Ct. 1421, 1429 (1985) (citation omitted). The true boundary, in my view, should not lie at the nethermost conceivable description of maritime commuter-workers, but at the line drawn by Congress's adoption of a maritime employment status test in the 1972 amendments to the LHWCA.[8] This leads me respectfully to disagree with the interpretation of the

<hr>

[8]See Longshoremen's and Harbor Workers' Compensation Act § 2(3), 33 U.S.C. § 902(3) ("The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker . . . .").

23

LHWCA adopted in Perini.  Although our lower court may not defy the High Court's ruling, it is useful to observe how interpretation of the statute could be brought more in line with its plain meaning.

Because much light has been shed on this debate by both the majority and dissenting opinions, I will frame my views succinctly.  First, I accept that Perini insists upon continued LHWCA coverage, irrespective of the 1972 amendment's definition of maritime employment, for any worker "injured while performing his job upon actual navigable waters." Perini, 459 U.S. at 299, 103 S. Ct. at 638.[9]  Although it is a close call, I disagree with the majority's conclusion that because Bienvenu voluntarily performed as much as 8.3% of his work duties on the vessel, i.e. repairing or maintaining equipment and tools, he was not merely "transiently" aboard and thus excluded from LHWCA coverage.  Perini's significant footnote disclaims any intent to rule on whether LHWCA "coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters . . . ."  459 U.S. 297, 326 n.34, 103 S.

_____

[9]Judge DeMoss's dissent correctly shows, however, that Perini and cases on which it relies, such as Parker, should not be relied upon to the extent that Congress specifically overruled them in the 1984 amendments to the LHWCA.  Moreover, while some may argue that Congress did not expressly overrule Perini in the 1984 LHWCA amendments, thus implicitly adopting the Perini construction of LHWCA coverage, this argument must fail in light of the express status test embodied in the 1972 amendments and retained, with further restrictions, by the 1984 amendments.  Based on the language of the statute, the 1984 amendments could just as easily be interpreted as a congressional reaffirmance of a strict status test for LHWCA coverage, regardless of situs.

24

Ct. 634, 651 n.34 (1983).  In <u>Herb's Welding</u>, the Court reiterates a likely limit to LHWCA coverage in another footnote which observes that Gray, a welder on fixed offshore oil and gas platforms

> traveled between platforms by boat and might have been covered, before or after 1972, had he been injured while in transit.  Even if he would have been covered for some small fraction of his time independent of the Lands Act, however, he is a far cry from the paradigmatic longshoreman who walked in and out of coverage during his workday and spent substantial amounts of his time "on navigable waters."  Any coverage attributable to the LHWCA itself was <u>de</u> <u>minimis</u>.  We also note in passing a substantial difference between a worker performing a set of tasks requiring him to be both on and off navigable waters, and a worker whose job is entirely land-based but who takes a boat to work.

<u>Herb's Welding, Inc.</u>, 470 U.S. at 427 n.13, 105 S. Ct. at 1429 n.13 (citing <u>Perini</u>, 459 U.S. at 324, 103 S.Ct. at 651).  At the least, "transiently" is closely related to "in transit", and both phrases are closely related to the description of "a worker whose job is entirely land-based but who takes a boat to work."  Indeed, Gray, like Bienvenu, ate and slept on a platform in Louisiana waters and spent 75% of his time working on platforms in state territorial waters.  <u>See</u> <u>Herb's Welding, Inc.</u>, 470 U.S. at 416, 105 S. Ct. at 1423.  On the basis of these careful disclaimers, there should be substantial doubt whether a pumper like Bienvenu who "takes a boat to work" should be covered by the LHWCA.  The majority purports not to answer this question, but their description of Bienvenu's "work" on board the <u>Miss Jackie</u> suffers from two flaws.  First, it sets up a test (a "modicum" of work, "not insubstantial" work) that can be

25

satisfied by artful pleading concerning the waterborne commuter's "work" performed en route to land-based jobs.[10] Second, it foreordains that employees like Bienvenu and Gray will continuously walk in and out of LHWCA coverage throughout the work day. These problems would be avoided by a holding that Bienvenu was only a commuter by boat in the course of performing his duties as an oil field worker. See Brockington v. Certified Elec., Inc., 903 F.2d 1523, 1528 (11th Cir. 1990) ("question of whether an individual is a maritime employee for purposes of LHWCA coverage is controlled by analysis of his 'basic' employment, rather than the employee's particular work at the moment of the accident").

Like the offshore welder Robert Gray, Bienvenu is hardly engaged in "maritime employment" under either a layman's conception of the term or the tighter definition imposed by the LHWCA. And from a common sense standpoint, it is hard to understand why Gray should have been covered solely by state workers compensation insurance, while Bienvenu is permitted also to benefit from the

---

[10]The majority predicts that my position would create as many problems as the ill-starred Robison test for seaman status. I hesitated deliberately to engage in similar vague and dire predictions about their view. But two observations are in order. First, they invoke the Barrett v. Chevron litigation-based test as a model for drawing lines among types of coverage in these cases; we are all thus in the same boat. Second, I believe we are all dealing with truly marginal cases in which coverage under a state compensation scheme or LHWCA may be arguable but ought at least to have some consistent rationale tied to real work "on the waters."

federal compensation program.[11]  The reason for these incongruous results, I suggest, lies not in the statute written by Congress but in the Supreme Court's awkward interpretation of it in Perini. Faced with 1972 LHWCA amendments that, for the first time, expressly defined coverage in terms of an employee's maritime work status as well as the appropriate situs, the Court held that the status determination was essentially relevant only to the landward extension of LHWCA.  Congress did not intend, the Court said, to modify the essentially situs-based test for coverage of those employed "on navigable waters" who would have been covered by the Act before 1972.

But the language chosen by Congress reflects no such bifurcated intent.  Even if Perini correctly described Congress's legislative intent as expressed in committee reports, such intentions do not substitute for the plain meaning of the statute. See Free v. Abbott Lab. (In re Abbott Lab.), 51 F.3d 524, 528 (5th Cir. 1995) ("We cannot search legislative history for congressional

---

[11]The majority blithely ignore this incongruity, in which two workers  otherwise similarly situated receive different forms of coverage based solely on the fortuitous location of the accident. Surely that incongruity is quantitatively worse than that which they espy in my position, whereby, they claim, offshore oilworkers may receive either state compensation or Seaman's benefits.  I disagree that such a consequence will be common.  But if it did occur, it would be based on a principled distinction concerning the basic nature of the employee's work and exposure to the risks of the sea.  The majority's pinched definition of "transient" and "fortuitous" accidents on the water leads, by contrast, to the type of capricious result they reach today.

intent unless we find the statute unclear or ambiguous."). Since Perini was decided, the Supreme Court has focused more carefully in statutory construction cases on the language that Congress chose, using that language as its basic guide to statutory interpretation.[12] It seems plain to me that the definition of maritime employment added to the LHWCA in 1972 is not limited to landward coverage questions but is also a requirement for coverage of injuries on navigable waters. This interpretation was certainly foreshadowed in early commentary on the 1972 amendments.[13] Further,

_____

[12]See City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 337, 114 S. Ct. 1588, 1593 (1994) ("[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law . . . ."); Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 618, 112 S. Ct. 2160, 2168 (1992) ("The question, however, is not what Congress 'would have wanted' but what Congress enacted . . . ."); Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 610 n.4, 111 S. Ct. 2476, 2484 n.4 (1991) ("No matter how clearly its report purports to do so, a committee of Congress cannot take language that could only cover 'flies' or 'mosquitoes,' and tell the courts that it really covers 'ducks.'"); Burlington N. R.R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 107 S. Ct. 1855, 1860 (1987) ("Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'").

[13]See, e.g., Perini, 459 U.S. at 326-28, 103 S. Ct. at 651-53 (Stevens, J., dissenting) ("If we ignore history, and merely concentrate on the text of the statute, the conclusion is inescapable that [the LHWCA] merely provides coverage for people who do the work of longshoremen and harbor workers . . . ."); Charles F. Tucker, Coverage and Procedures Under the Longshoremen's and Harbor Workers' Compensation Act Subsequent to the 1972 Amendments, 55 Tul. L. Rev. 1056, 1060-68, 1088 (1981) ("For a worker to be covered under the Act, he must not only meet the situs requirement of section 903(a), but he must also meet the status test of section 902(3) . . . ."); Roberto L. Corrado, Note, Director, Office of Workers' Compensation Programs v. Perini North

28

it is not an absurd construction of the Act to hold that a federal program to compensate "longshore and harbor workers" should encompass maritime employment in a traditional sense rather than, e.g., oil field workers.  Finally, this is not an abstractly unfair construction of the statute, inasmuch as there is no longer any doubt that workers like Bienvenu are covered by state compensation schemes.

Thus, under a strictly textual reading of the LHWCA, if we were not bound by Perini, I would hold that Bienvenu was not engaged in maritime employment for coverage purposes.  Even bound by Perini, however, it seems to me that Bienvenu was injured "transiently", as Perini and Herb's Welding used that term, and should not receive LHWCA coverage overlapping that provided under state workers' compensation.  I respectfully dissent.

---

River Associates: Judicial Dilution of the Longshoremen's and Harbor Workers' Compensation Act's 'Status' Requirement, 33 Cath. U. L. Rev. 245, 277 (1983) ("The Court's overly expansive view of the LHWCA controverts the plain meaning of the Act, and restricts Congress' attempt to apply a test of maritime status to all workers injured on the actual navigable waters of the United States."); Harold K. Watson, Comment, Broadened Coverage Under the LHWCA, 33 La. L. Rev. 683, 693 (1973) ("Now, in order to recover, the employee must once again show his [own] status as a maritime employee before the broadened situs-oriented coverage provision will inure to his benefit."); see also, e.g., Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law, §§ 89.27(c), 89.41 (1998) (discussing implications of 1972 amendments and development of LHWCA coverage in light of Perini) ("[T]he boundary will no doubt be drawn on a case-by-case basis, rather than on the basis of some all-purpose general test or principle.").

DeMOSS, Circuit Judge, with whom, SMITH, Circuit Judge, joins dissenting:


With all due respect for my colleagues in the majority, I am unable to concur in their decision for the following reasons.


## I.   Chronology of significant events

Any explanation of my disagreements with the majority has to begin with an overview of the key factual and legal events, which I find determinative of the legal issues presented in this case. First, I will briefly reprise the facts giving rise to Bienvenu's claims, as either stipulated to by the parties or found by the administrative law judge.

This case began over eleven years ago.  On April 10 and 11, 1987, Bienvenu suffered back sprains which resulted in his having to stop working for Texaco on July 19, 1987.  Soon thereafter, on September 1, 1987, Bienvenu underwent back surgery.  By January 31, 1989, Bienvenu had achieved maximum medical improvement following his surgery.

Texaco's workers' compensation insurance carrier made payments to Bienvenu pursuant to the Louisiana Workers' Compensation Law. During the period from July 19, 1987 to May 29, 1991, Bienvenu received $261 per week; from May 30, 1991 to July 30, 1992 he received $522 per week.  In addition, all of Bienvenu's medical

bills were paid by Texaco's insurance carrier, as required by the Louisiana Workers' Compensation Law.

All was as it should have been until December 3, 1990, when Bienvenu filed a claim for benefits under the federal Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (hereinafter, LHWCA). Almost two years later, on October 14, 1992, an administrative law judge conducted a hearing regarding Bienvenu's LHWCA claim. The decision was handed down after yet another year of delay, on November 30, 1993. *See* **Bienvenu**, No. 92-LHC-2801, slip op. at 4-5, 27 Ben. Rev. Bd. Serv. (MB) 547(ALJ), 550-51 (Dep't Labor Nov. 30, 1993).

In addition to these factual events, there are two key legal events that have a significant impact on Bienvenu's claim. The first of these is the enactment of amendments to the LHWCA, effective on September 28, 1984. Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub. L. 98-426, sec. 2(a), 98 Stat. 1639, 1639 (codified at 33 U.S.C. § 902(3)(A)-(F)). The second is the decision by the Supreme Court in **Herb's Welding, Inc. v. Gray**, 470 U.S. 414, 105 S. Ct. 1421 (1985), which was argued on October 3, 1984, and related to an accident which occurred on July 11, 1975, and therefore was not governed by the 1984 LHWCA Amendments.

31

Today, more than eleven years after the injuries occurred, more than thirteen years after the decision in *Herb's Welding*, and more than fourteen years after the 1984 LHWCA Amendments took effect, we are still attempting to decide which compensation statute is applicable to Bienvenu's injuries. That fact, standing alone, is a tragic commentary about the ambiguities of our LHWCA jurisprudence. This ambiguity, and the attendant delay is, unfortunately, an example of what the United States Congress intended to prevent by adopting the 1984 LHWCA Amendments.

**II. What effect did the 1984 amendments to the LHWCA have on the question of whether relief should be under state workers' compensation statutes or the LHWCA?**

Amazingly, in Part II of its opinion, the majority reviews the entire history of the LHWCA from the Supreme Court's decision in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S. Ct. 524 (1917), right down to the Supreme Court's 1985 opinion in *Herb's Welding*, yet fails in recounting this historical background to mention once, much less apply or construe, the 1984 LHWCA Amendments. This legislation made significant changes in the structure and applicability of the LHWCA. Most significantly, the 1984 LHWCA Amendments defined six new categories of employment which were *not* included in the definition of the term "person engaged in maritime employment," if the individuals described therein "are subject to

32

coverage under a State workers' compensation law."  *See* 33 U.S.C. § 902(3).

The express statutory language of § 902(3) specifies that persons employed to perform certain tasks (described in clauses A, E, and F) or employed by certain employers (described in clauses B, C, and D) are *not* included within the definition of the term "person engaged in maritime employment" if the individuals described by clauses (A) through (F) are subject to coverage under a state workers' compensation law.  Thus, in resolving the question of whether an injured worker is entitled to state compensation benefits or to LHWCA compensation benefits, the first inquiry which must logically be made is whether or not any one or more of clauses (A) through (F) apply to his employment.<sup>**************</sup>  If so, we must then ask whether the worker was subject to state workers' compensation law.  If a worker was not covered by any state compensation statute, then none of clauses (A) through (F) can act to deny or remove him from coverage under the LHWCA.  But if state workers' compensation covers the employee, and if any one or more of the § 902(3) subclauses apply, then the injured worker is not "a person engaged in maritime employment" and he is therefore not an

---

<sup>**************</sup> No one contends that Bienvenu fits into the enumerated categories of "any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker" specified in § 902(3), as to which there would be no doubt that the LHWCA is the exclusive compensation regime.

33

"employee" as defined in § 902(3). If he is not an employee, he is not entitled to compensation benefits under the LHWCA, regardless of the location, or "situs," of his injury, because the situs test specified in 33 U.S.C. § 903(a) is applicable only to the "disability or death of an *employee*" as defined in the LHWCA.*************** Consequently, the changes made by the 1984 LHWCA Amendments constitute clear, deliberate action on the part of Congress to withdraw LHWCA coverage from those individuals described in clauses (A) through (F), even in the circumstance that their injuries occurred upon "navigable waters" in the course of their employment, and despite the fact that they might have been covered by LHWCA prior to the enactment of the 1984 LHWCA Amendments.

The withdrawal of LHWCA coverage on the condition that the injured worker is "subject to coverage under a State workers'

---

*************** The statute provides:

> Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a). This limitation on LHWCA coverage is commonly known as the "situs" requirement.

compensation law" is a significant change from prior law. The 1984 LWHCA Amendments reflect congressional recognition of the interplay between the separate state and federal workers' compensation schemes, and legislatively dictate that in the circumstances in which individuals falling within the purview of clauses (A) through (F) are already subject to state workers' compensation benefits, those state workers' compensation benefits are the exclusive benefits for those particular workers.

While the 1984 LHWCA Amendments are plain on their face, and there is no need to look at legislative history when there is no ambiguity in the statutory language, I nevertheless think that a look at legislative history is useful in this case in order to understand what Congress was attempting to accomplish by the 1984 LHWCA Amendments. For example, the House Report states that the 1984 amendments were intended to

> insure stability for both the employer and the employee. The employer needs to know its obligations with respect to workers' compensation for its employees, and make plans accordingly. *Employees should not fall within the coverage of different statutes because of the nature of what it is they were doing at the moment of injury.*

H.R. Rep. No. 98-570, pt. 1, at 6 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2734, 2739 (emphasis supplied). The Senate report on the Senate bill which initiated the legislative process is even

more specific and expressive as to the purposes of the 1984 LHWCA Amendments. *See* S. Rep. No. 98-81 (1983).

From the language used by Congress in the 1984 LHWCA Amendments, and from the explanations provided by Congress in legislative history regarding the need for and purpose of the 1984 LHWCA Amendments, several congressional intentions become abundantly clear. *First*, Congress sought to correct, overrule, or reverse situations in which "courts and agencies have found coverage which [is] not warranted."*************** *Second*, Congress attempted to define situations in which the "nexus to maritime navigation and commerce" was insufficient to justify the imposition of the federal compensation scheme.*************** *Third*, Congress

---

*************** "It is clear from the abundant record developed at the ove[r]sight hearings that a pressing need exists to revise portions of the act. The courts and agencies have found coverage to exist in situations which are not warranted." S. Rep. No. 98-81 at 20. "[T]he decade of experience under the 1972 Amendments has vividly demonstrated that the effort to eliminate benefit disparity and to promote systemic uniformity has exacted a price, too. The rules of coverage, in the words of one authority, have been a 'doubly prolific generator of litigation.'" *Id*. at 24-25 (quoting 4 A. Larson, Workmen's Compensation § 89.27(b), at 16-180 (1983)).

*************** In this vein, the Senate report reflects the following judgments about situations in which the connection between employment and traditional maritime duties are too attenuated to support LHWCA coverage:

> Additionally, the committee would like to clarify that certain establishments, and their employees, such as clubs, camps, restaurants, museums, retail outlets and marinas are exempt from coverage regardless of their location.

36

recognized that "appropriate state compensation laws" can often provide coverage to the employees involved "more aptly."***************

The committee received numerous complaints from these employers and their insurance carriers that indicate a general confusion as to whether or not the Longshore Act applies. These businesses are operated on or over a navigable water and insurance carriers, fearing a claim under the act, often require Longshore riders on their workers compensation insurance policies.

The committee believes that these employers lack the necessary nexus to maritime employment and commerce and therefore are properly exempted from the jurisdiction of the act.

S. Rep. No. 98-81 at 29.

*************** The report states, in pertinent part:

[T]he lower courts as well as the Benefits Review Board in the past have often been divided on the proper criteria for determining such issues as "maritime employment" and "adjoining area." (See, e.g., discussion in 4 A. Larson, Workmen's Compensation § 89.42 at pp. 52-53 (Supp. 1981)).

. . . Uncertainty of coverage fosters continued litigation, with attendant expense and delay that is a burden to employers, their insurance carriers, and claimants.

. . . .

. . . Rather, the consensus among the committee members was to reaffirm the purposes of the 1972 jurisdictional changes, and in that light, the committee narrowed its focus to certain fairly identifiable employers and employees who, although by circumstance happened to work on or adjacent to navigable waters, *lack a sufficient nexus to maritime navigation and commerce*. The committee's attention was directed to specified activities which were singled out for criticism by numerous

*Fourth*, Congress aimed to protect the principle that workers' compensation is an employee's exclusive remedy against the employer.***************

None of the language added by the 1984 LHWCA Amendments can be read to provide for an injured worker to receive both state and LHWCA benefits. Likewise, none of the language added by the 1984 amendments can be read to adopt the concept articulated by the Supreme Court in **Director, OWCP v. Perini North River Associates**, 459 U.S. 297, 103 S. Ct. 634 (1983), that "injury on navigable waters in the course of employment" is all that is needed to establish "maritime employment" for the purpose of bestowing LHWCA coverage. To the contrary, the broad, simple, unqualified language used in the various clauses of § 902(3) necessarily moots consideration of that factor.

---

witnesses before the committee. Under this case-specific approach, the committee has determined that certain activities do not merit coverage under the act and *that the employees involved are more aptly covered under appropriate state compensation laws.*

S. Rep. No. 98-81 at 25 (emphasis supplied).

*************** "Judicial interpretations of the act have allowed for dual recovery under both State workers' compensation and LHWCA. This violates the principle of workers' compensation that it is the employer's exclusive remedy. Current law undermines this principle when an employer faces both Federal and state programs." S. Rep. No. 98-81 at 30.

## III. Effect of the 1984 LHWCA Amendments on the Supreme Court's Holding in *Perini*

The principal case which the majority relies on to determine Bienvenu's compensation rights is the 1983 decision of the Supreme Court in *Perini*. Obviously, *Perini* related to facts and circumstances which occurred after adoption of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub. L. 92-576, 86 Stat. 1251, but before the 1984 LHWCA Amendments. There is nothing in the *Perini* opinion which even recognizes the pendency before Congress of what later became the 1984 LHWCA Amendments. Nevertheless, the majority relies upon *Perini* to establish two essential premises. The first of these is that under the law prior to the 1972 LHWCA Amendments, a worker injured on actual navigable waters in the course of his employment on those waters automatically satisfied the status requirement of the LHWCA. The second premise is that nothing in the 1972 LHWCA Amendments indicates a congressional intent to withdraw LHWCA coverage from workmen covered by the Act before 1972. *See* Majority Op. at 13-14. The majority then refers to three prior Supreme Court opinions upon which the *Perini* Court relied in making these conclusions: *Parker v. Motor Boat Sales, Inc.*, 314 U.S. 244, 62 S. Ct. 221 (1941); *Davis v. Department of Labor & Industries*, 317 U.S. 249, 63 S. Ct.

225 (1942); and **Calbeck v. Travelers Insurance Co.**, 370 U.S. 114, 82 S. Ct. 1196 (1962).

The majority identifies **Parker** as the case "most relevant to our decision" in this case. But the 1984 LHWCA Amendments adopted by Congress substantially undercut the rationales of both **Perini** and **Parker**. For instance, if the factual circumstances involved in **Parker** (a janitor employed by a retailer of pleasure craft assists a salesman placing an outboard motor on a boat and accompanies the salesman on a demonstration run; the boat then capsizes and the janitor is killed) had occurred after the passage of the 1984 LHWCA Amendments, the current statutory terms would expressly preclude LHWCA coverage for the janitor because he was "employed by a . . . retail outlet," § 902(3)(B), and he was "employed to build, repair, or dismantle a recreational vessel under 65 feet in length," § 902(3)(F). Since the janitor in **Parker** was determined to be an LHWCA employee, but that same janitor would no longer be covered by the statute, the value of that opinion is substantially diminished.*************** Likewise, **Perini**'s blanket holding -- that the

---

*************** Just a cursory review of footnote 21 in **Perini**, 459 U.S. at 311, 103 S. Ct. at 644, indicates the following additional categories where the 1984 LHWCA Amendments would change the status of the injured employee described in the following pre-1972 cases:

1.   **Nalco Chem. Corp. v. Shea**, 419 F.2d 572 (5th Cir. 1969) (pilot salesman traveling to offshore platform) would be changed by § 902(3)(D) ("individuals employed by suppliers, transporters, or vendors . . ."); and

40

1972 LHWCA Amendments preserved and supplemented the entirety of pre-1972 LHWCA coverage -- should have little influence after the adoption of the 1984 LHWCA Amendments, which obviously do retract coverage from the pre-1972 boundaries. The modifications demolished the *Perini* proposition by unequivocally withdrawing LHWCA coverage from certain workers, despite the fact that they may have been injured on actual navigable waters in the course of their employment.

## IV. What effect did the 1984 LHWCA Amendments have on the rule announced by the Supreme Court in *Herb's Welding*?

The casualty involved in the *Herb's Welding* case occurred in July 1975, after passage of the 1972 LHWCA Amendments, but before passage of the 1984 LHWCA Amendments. The case was argued before the Supreme Court on October 3, 1984, just five days after the effective date of the 1984 LHWCA Amendments. Since the accident occurred before the 1984 LHWCA Amendments were adopted, it is not surprising that there is no discussion of that statutory development in the *Herb's Welding* opinion. That decision

---

2. *Holcomb v. Robert W. Kirk & Assoc., Inc.*, 655 F.2d 589 (5th Cir. Unit B Sept. 1981) (watchman injured while working on vessel); *Interlake S.S. Co. v. Nielson*, 338 F.2d 879 (6th Cir. 1964) (watchman); and *Rex Investigative & Patrol Agency, Inc. v. Collura*, 329 F. Supp. 696 (E.D.N.Y. 1971) (land-based employee sent temporarily onto vessel to act as watchman), would be changed by § 902(3)(A) ("individuals employed exclusively to perform . . . security . . . work").

41

nevertheless has a significant application in the present controversy. First and foremost, **Herb's Welding** plainly held that the work activities which the claimant, Gray, performed on a fixed platform supporting a well producing oil and gas did not qualify Gray as a "person engaged in maritime employment" under the 1972 LHWCA Amendments. The Supreme Court arrived at this conclusion not only by considering the nature of Gray's work activities (which had nothing to do with the loading, unloading, or repair of any vessel), but also by reviewing the history of how Congress had viewed the activities of offshore production of oil and gas. *See* **Herb's Welding**, 470 U.S. at 419-26, 105 S. Ct. at 1425-28. Relying on its earlier decision in **Rodrique v. Aetna Casualty & Surety Co.**, 395 U.S. 352, 89 S. Ct. 1835 (1969), the Court discussed numerous aspects in which Congress had made clear that the production of oil and gas from fixed platforms is not a maritime activity. Specifically, the court stated (1) that activities on drilling platforms are not even suggestive of traditional maritime affairs; (2) that in adopting the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (hereinafter, Lands Act), Congress had expressly decided that "maritime law" would *not* apply to operations on fixed platforms; (3) that the history of the Lands Act at the very least forecloses the conclusion that offshore drilling is a maritime activity and that any task essential thereto is maritime

42

employment for LHWCA purposes; and (4) that Congress must have been familiar with *Rodrique* and the Lands Act when it used the term "maritime employment" in the definition the term "employee" in the 1972 LHWCA Amendments. *Herb's Welding*, 470 U.S. at 420-23, 105 S. Ct. at 1426-27. Furthermore, the Court pointed out that in prior cases interpreting the 1972 LHWCA Amendments, the Court had said "the 'maritime employment' requirement is 'an occupational test that focuses on loading and unloading,'" *id.* at 423, 105 S. Ct. at 1427 (quoting *P.C. Pfeiffer & Co. v. Ford*, 444 U.S. 69, 80, 100 S. Ct. 328, 336 (1979)), and that while "'maritime employment' is not limited to the occupations specifically mentioned" in § 902(3), "neither can it be read to eliminate any requirement of a connection with the loading or construction of ships," *id.* According to the Court, both *P.C. Pfeiffer & Co.* and *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 267, 97 S. Ct. 2348, 2359 (1977), "lead us to the conclusion that Gray was not engaged in maritime employment for purposes of the LHWCA." *Herb's Welding*, 470 U.S. at 423, 105 S. Ct. at 1428. In conclusion, the Supreme Court in *Herb's Welding* held: "Because Gray's employment was not 'maritime,' he does not qualify for benefits under the LHWCA. *We need not determine whether he satisfied the Act's situs requirement.*" *Id.* at 427, 105 S. Ct. at 1429 (emphasis supplied).

43

*Herb's Welding* teaches us that the first decision to be made in determining LHWCA coverage is whether the injured worker satisfies the status requirement of the definition of "a person engaged in maritime employment."  The changes made by the 1984 LHWCA Amendments to the status definition in § 902(3) do not directly address the category of workers on a fixed platform for the production of oil and gas.  But *Herb's Welding* states that "there is nothing inherently maritime" about the tasks Gray performed in that case.  Likewise there is "nothing inherently maritime" about the tasks Bienvenu performed in this case.

**V.   What was Bienvenu actually doing during 8.3% of his work time?**

The majority attaches controlling significance to the fact that Bienvenu was performing work on board the MISS JACKIE during 8.3% of his work time.  They pay very little attention to carefully describing the nature of the work Bienvenu performed while on board the MISS JACKIE.  Because the nature of the work which Bienvenu performed while on board the MISS JACKIE is critically important to a proper determination of the status question in this case, I quote the following findings of fact made by the administrative law judge:

> In terms of size, the Caillou Island production field is approximately five miles north and south and ten to twelve miles east and west. . . . During the year 1987, the Caillou Island production

44

field had approximately 150 to 175 producing wells. All of the wells were located inside of the three mile territorial limit. The majority of the wells were located in water areas and bays and contained a small platform constructed around the well heads. The platforms were constructed of pilings similar to telephone poles driven into the mud below the water line and then wood was constructed on top with metal grading to allow the workers to walk on. The entire unit was referred to as a cribbing which was about six feet wide by twelve to fifteen feet long. The cribbings had no living quarters.

During the period of his work with Texaco, Mr. Bienvenu never worked off-shore on the outer continental shelf. All of his work was inside the three-mile limit.

Mr. Bienvenu was working as a pumper specialist at the time of his injury. *In that job, he did maintenance of automated equipment in the production facilities. The equipment included a variety of measuring gauges consisting primarily of fluid measuring meters. His responsibility was to maintain the equipment.* He used other meters to test the equipment and calibrate it. . . . Each meter had to be calibrated approximately every three months. Other meters which he maintained were fixed on platforms and he also was responsible for maintaining that equipment. Mr. Bienvenu had a tool box which included all of his hand tools. The tool box weighed approximately eighty pounds or more. The box had to be moved from one well to another as the work sites changed.

. . . Mr. Bienvenu had almost exclusive use of the Miss Jackie, however, on occasion the boat was used by others. Mr. Bienvenu would simply tell the skipper of the Miss Jackie which particular cribbing he was to be taken to. The Claimant [Bienvenu] did not navigate the boat, although his tools were basically maintained on the boat. He did not perform maintenance work on the boat itself. However, *he did perform work on some of the well controls on the back part of the boat.*

45

> *Claimant's job as a pumper specialist required him to perform the majority of his work on the platforms.  However, some of the work was performed on the back of the boat which transported him to the job site*.  Of the two to three hours that he was on the Miss Jackie on an average day, approximately one hour of that time was spent actually working on equipment on the boat.  The rest of the time was spent on the Miss Jackie moving from location to location.  The remaining nine hours of the day was spent on a fixed platform in the island field doing his work as a pumper specialist.

**Bienvenu**, No. 92-LHC-2801, slip op. at 4-5, 27 Ben. Rev. Bd. Serv. (MB) at 550-51 (emphasis supplied).

From these findings it is absolutely clear that the work which Bienvenu did on the stern of the MISS JACKIE was directly related to and an essential part of his primary job responsibility, which was to maintain, repair, and replace as necessary, the gauges and meters which measured the flow of oil and gas from each fixed platform.  This work activity had absolutely nothing to do with loading or unloading a vessel, nor with repairing or maintaining equipment used to load or unload a vessel, nor with repairing or maintaining the vessel itself, nor with repairing or maintaining any dock, wharf, or pier used for the loading or unloading of any vessel.  Bienvenu's work activity on the stern of the boat was not "inherently maritime" in nature.  Given the express holding by the Supreme Court in **Herb's Welding**, the conclusion is inescapable that

46

the work activities which Bienvenu performed on the stern of the MISS JACKIE were not maritime in nature.

Consequently, the majority errs grievously when it concludes that, because of the performance of these non-maritime work activities on the stern of the MISS JACKIE, Bienvenu somehow transforms himself from a worker engaged in non-maritime employment (as **Herb's Welding** surely holds he was) into a worker entitled to claim the benefits of a "maritime employment" status simply because his injury occurred "on navigable waters." This conclusion is even more incomprehensible in light of the fact that his injury *did not actually occur* during the time that he was working on the stern of the MISS JACKIE maintaining and repairing the equipment removed from the production platform.

**VI. The majority decision is in direct conflict with *Green v. Vermilion* and leaves that conflict unresolved.**

A further problem presented by the majority's treatment of this case is its conflict with the recently decided **Green v. Vermilion Corp.**, 144 F.3d 332 (5th Cir. 1998), *petition for cert. filed*, 67 U.S.L.W. ____ (U.S. Jan. 14, 1999) (No. 98-1128). There are many factual similarities between this case and **Green.** Both Green and Bienvenu were land-based workers whose primary non-maritime duties took up the major portions of their work time. Both Green and Bienvenu sustained injuries on vessels which were

47

owned by their respective employers.  Both injuries occurred after the effective date of the 1984 LHWCA Amendments.  In both cases, the vessel involved was a relatively small vessel which needed only one person to operate it.  At the time of injury in both cases, the vessels were tied up at a dock in an area which it may be "legally accurate" to define as "navigable waters," but which was not in any sense a channel of commerce for interstate or foreign shipping. The waters involved in both cases were entirely within the territorial waters of the State of Louisiana.  Neither Green nor Bienvenu performed any tasks for the purpose of maintaining or repairing the vessel in question, nor did either operate or navigate such vessel while it was in transit.

At the moment of his injury, Green was helping to unload supplies brought by boat to the duck camp where he worked.  This is an activity upon which the *Green* panel might have focused for purposes of finding LHWCA coverage, but did not.  At the moment of his injury, Bienvenu was lifting his personal tool box on or off of the boat on which he rode between well platforms; this is an activity which the majority itself excludes from the category of "meaningful job responsibilities."  Majority Op. at 17.

Following their injuries, both Green and Bienvenu received full medical care and weekly compensation benefits under the Louisiana Workers' Compensation Law.  Each of them ultimately made

48

claims for LHWCA benefits. Green sued his employer directly in federal district court, and the district judge denied him any recovery. Bienvenu filed an administrative claim directly under the LHWCA, but the administrative law judge held that the LHWCA did not apply to his injury. Both Green and Bienvenu appealed to our Court. In Green's case, a panel of our Court affirmed the district court's determination that Green was not entitled to benefits under LHWCA. *See* **Green**, 144 F.3d at 335. In Bienvenu's case, the panel concluded that it was bound by precedent to hold that Bienvenu is entitled to LHWCA benefits because of his transient or fortuitous presence upon actual navigable waters. *See* **Bienvenu**, 124 F.3d at 693. After en banc reconsideration the majority now confirms the availability of LHWCA benefits, but on different grounds.

These two decisions are hopelessly at odds, and our Court should put them in the same category so that they produce the same result. **Green** concluded that by enacting the 1984 LHWCA Amendments, Congress expressly determined that Green was not engaged in "maritime employment" for the purposes of LHWCA coverage because he was employed by a "club or camp" and covered by state compensation. *See* 33 U.S.C. § 902(3)(B). In essence, Congress legislatively determined that "non-maritime" status may trump the "situs" aspect of a particular injury. The panel in **Green** correctly affirmed the district court's denial of LHWCA benefits to

49

Green because Congress statutorily eliminated Green's employment from those which could be considered to be "maritime employment."

In my view, we should have applied the same analysis to Bienvenu's claim. In *Herb's Welding*, the Supreme Court held that a worker on a fixed platform producing oil and gas from territorial waters of a state is not engaged in maritime employment and therefore not entitled to LHWCA benefits. *See Herb's Welding*, 470 U.S. at 423-26, 105 S. Ct. at 1427-28. The work which Bienvenu performed on fixed platforms is analogous to the work which Gray performed on fixed platforms in that case. Why doesn't Bienvenu's non-maritime status trump his situs in this case? Why doesn't the Supreme Court's determination that producing oil and gas from fixed platforms in state waters is not a "maritime employment" constitute just as binding a determination of "non-maritime status" as if Congress had included in § 902(3) another sub-clause saying that "maritime employment" does not include individuals employed to build, repair, maintain, operate, or dismantle fixed platforms on which there are facilities for the exploration, production, or storage of oil and gas from territorial waters of any state?

The only thing that distinguishes Bienvenu's claim from Gray's is that in *Herb's Welding* the worker was injured on a fixed platform, while Bienvenu was injured on a vessel tied to a fixed platform. That factual distinction should not be determinative.

50

First, it is important to note that one of the themes underlying the enactment of the 1972 and 1984 LHWCA Amendments was eliminating the circumstance of workers walking in and out of coverage, such that LHWCA applicability depends upon whether a worker's injury occurred on the vessel or on the dock. This approach should likewise be applied to those workers whose status is determined to be "non-maritime" either by act of Congress or by a decision of the Supreme Court. Both employers and employees benefit from the uniformity and predictability of coverage which would be achieved by eliminating controversies centered on the circumstance of whether a non-maritime worker's injury occurred on land or water.

If Bienvenu sustained an injury while actually repairing a valve on the fixed platform, there is no question that he would not be entitled to LHWCA benefits and his compensation benefits would be under Louisiana state workers' compensation. If Bienvenu spends the overwhelming majority of his time working on fixed platforms, his "non-maritime" status should not change when he gets on a boat to ride to or from his place of work, or to perform some limited non-maritime task. Bienvenu's non-maritime status should not change unless and until the nature of his work assignments change so that he is engaged for a substantial portion of his work time in activities which meet the test of "maritime employment."

Additionally, in making factual and legal determinations about a worker's maritime or non-maritime status, we should employ the

51

same rationale and methods of analysis that our Court and the Supreme Court have recognized as being necessary to the task of distinguishing between the status of "seaman" or "member of the crew of a vessel" for Jones Act purposes on one hand and "longshoreman, harbor worker, or other maritime employment" for LHWCA purposes on the other. It is noteworthy that the clause of § 902(3) which determines that a "master or member of the crew of any vessel" is *not* a "person engaged in maritime employment" for LHWCA purposes is clause (G), which follows immediately after clauses (A) through (F), which were added by the 1984 LHWCA Amendments. It seems quite logical and appropriate that the law should be the same for all of these clauses in § 902(3). I turn now to some brief comments in that regard.

Our Court should be guided by the examples set in three important Supreme Court cases -- *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 111 S. Ct. 807 (1991); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 115 S. Ct. 2172 (1995); and *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 117 S. Ct. 1535 (1997) -- which were decided after *Perini* and *Herb's Welding*, and after the adoption of the 1984 LHWCA Amendments. These cases, taken together, constitute the best summary of current Supreme Court precedent on distinguishing a "seaman" from a "longshoreman." Each case makes a significant contribution to the task of defining the

52

boundary lines between "seaman" or "member of the crew of a vessel" (seaman status) and "longshoreman, harbor worker, or other maritime employment worker" (longshoreman status).  Both *Wilander* and *Latsis* contain excellent historical reviews of the origination of the relevant concepts and principles.  Each of these historical summaries also points out the several instances in which the Supreme Court has changed course in making this delineation, either as the result of statutory action by Congress or by later definition of the Supreme Court itself.

These three recent Supreme Court opinions lead to a number of conclusions which should inform our judgment in this case.  First, regardless of what the law may have been at one time, it is now clear that the two categories of seaman status and longshore status are mutually exclusive.  Second, we now know that seaman status is determined primarily by the worker's connection with a vessel (or vessels) -- a connection which must be substantial both in duration and nature.  Third, it has been determined that a maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally a land-based worker, and therefore he is not considered to be a member of the vessel's crew, regardless of what his duties are.  Fourth, our Court has identified an appropriate rule of thumb for determining whether a worker has achieved Jones Act seaman status in the ordinary case -- a worker

who spends less than 30% of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. *See, e.g.*, **Barrett v. Chevron, U.S.A., Inc.**, 781 F.2d 1067, 1076 (5th Cir. 1986) (en banc). The Supreme Court has blessed this objective test. *See* **Latsis**, 515 U.S. at 366-68, 115 S. Ct. at 2189. Finally, we know that if an employee's regular duties require him to divide his time between vessel and land, his status as a crew member is determined "in the context of his entire employment" with his current employer.

In order to achieve the goals of uniformity and predictability, when determining LHWCA coverage we should follow this same pattern, which our Court has pioneered in dividing workers between seaman or longshoreman status. First of all, we should hold that the status of a longshoreman and the status of a non-maritime worker are mutually exclusive. To fit into either category, we should look at the type and nature of a worker's duties over a period of employment. In order to determine that an employee fits into either category, we should require determination that his work assignments in that particular category be substantial in terms of both their duration and nature. We should use our rule of thumb from seaman status cases and hold that a worker who spends less than 30% of his time in maritime employment should not qualify for LHWCA benefits. In connection with workers

54

who must travel over water to get to their work site, the time in transit over water should be counted as time attributable to the status of the duties performed at the work site.  If a worker is employed in both maritime and non-maritime tasks, his remedies should be determined by the controlling status, regardless of where the injury occurred.

Applying the foregoing concepts to the factual determinations made by the administrative law judge here in this case, I would conclude that, because Bienvenu worked nine hours of his regular twelve-hour workday performing repair work on the fixed platforms (a task which clearly falls within non-maritime status) and spent another two hours in transit between his work sites at each platform, his non-maritime status is controlling.  Indeed, his non-maritime work represents more than 90% of his total employment time.  Consequently, I would affirm the administrative law judge's holding that Bienvenu was not entitled to benefits under the LHWCA because his controlling employment status was not maritime in nature and he was covered by state workers' compensation. Accordingly, Green and Bienvenu would fall into the same category insofar as LHWCA coverage is concerned.

## VII. Where did the "transient or fortuitous" straw man and the "more than a modicum" test come from?

I must express my discomfort with some of the analysis and reasoning employed in Part III.B of the majority opinion. As an initial matter, the problem of "transient or fortuitous presence on a vessel" simply is not featured in the holdings of either *Perini* or *Herb's Welding*. That concept exists only in dicta, relegated to footnotes, in which the Supreme Court is speculating about circumstances not before the Court in either case. Likewise, there is no language in the LHWCA which can be construed to require any such determination in the course of determining status. I am truly amazed at the willingness of the majority to guess the meaning of "the signals from the Supreme Court in *Perini* and again in *Herb's Welding*" on the subject of whether the LHWCA covers a worker who is "simply transiently or fortuitously aboard a vessel." While the majority's guess may be correct, it seems inordinately presumptuous to use that guess as a launching pad for rewriting the law of the Circuit. Furthermore, I cannot understand the majority's reference to "joining to Eleventh Circuit in reaching this conclusion" on the basis of *Brockington v. Certified Electric Inc.*, 903 F.2d 1523 (11th Cir. 1990). There is absolutely nothing in *Brockington* which addresses the concept of a worker's "transient or fortuitous" presence aboard a vessel. Rather, I read *Brockington* as addressing

56

head-on the fundamental question of "status." The **Brockington** Court stated:

> In order to answer this question, one must determine whether "employment" is defined by what he was doing at the *moment* he was injured, or whether it is defined by the nature of employment in which he was *generally* engaged. This question was addressed by the Supreme Court in **Northeast Marine Terminal Co. v. Caputo**, 432 U.S. 249, 97 S. Ct. 2348 (1977), where it held that the question of whether an individual is a maritime employee for purposes of LHWCA coverage is controlled by analysis of his "basic" employment, rather than the employee's particular work at the moment of the accident. . . . What matters to a determination of maritime status is the description of his *regular* employment.

902 F.2d at 1528. Applying that concept, the **Brockington** Court concluded that an electrician whose duties consisted primarily of wiring houses and commercial buildings had no connection to "traditional 'loading and unloading' activity" and that the "'marine environment' in which he was injured had absolutely no connection to the general nature of his employment." **Id.** If the majority truly wants to join the Eleventh Circuit in this rationale, I would gladly concur because Bienvenu's "regular employment" as a pumper specialist on fixed production platforms is clearly recognized by the Supreme Court in **Herb's Welding** as being non-maritime employment.

Second, I find the new rule postulated by the majority to be enormously convoluted, and I predict that it will generate

litigation rather than avoid it.  The majority's critical measure of the necessary degree of maritime employment to trigger LHWCA coverage -- "more than a modicum" -- is inherently subjective and destroys the hope for predictability and uniformity of results in determining whether an injured worker gets state compensation benefits or LHWCA benefits.

Finally, I have to disagree with the majority's attempts to "clarify our case law on this subject."  The majority opinion is just flat wrong in its description of the holding in *Fontenot v. AWI, Inc.*, 923 F.2d 1127 (5th Cir. 1991).  The holding in that case is that the claimant was "covered by the LHWCA because he was on actual navigable waters in the course of his employment at the time of his injury." *Fontenot*, 923 F.2d at 1133.  The panel in *Fontenot* did address, but ultimately left open and did not decide, the question of whether "the fact that Fontenot spent 30% of his time working on an oil production vessel and was returning from a job on such vessel when he injured himself" would satisfy the LHWCA's status test.  The majority opinion goes on to castigate the panel in *Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888 (5th Cir. 1994), for misreading *Fontenot*.  But the panel in *Randall* read the holding in *Fontenot* exactly as it reads.  It is the majority in this case which now wants to impute to *Fontenot* a holding which was never made in that case.  While I recognize that our en banc Court is not

58

bound by either *Fontenot* or *Randall*, I cannot, for the life of me, see how we can overrule *Randall* without also overruling the express holding in *Fontenot*.

## VII. Conclusion

If there is any area of jurisprudence which mandates the highest level of clarity, simplicity, predictability, and efficiency, it is the area of workers' compensation benefits. An injured worker is entitled to prompt medical care and treatment for his injuries, some cash payments during convalescence, and ultimate compensation for permanent injuries. He should not have to guess where to get these benefits. Likewise, the employer who wants to provide compensation benefits should be able to accurately predict which compensation regime is applicable to his employees, and he should not have to guess, at the risk of greater liability, which is the right regime. With employers like Texaco who have workers in many different states and in other countries -- workers who are engaged in activities on land, sea, and in the air -- the task of determining the appropriate compensation remedy should turn on objective rather than subjective factors. The majority opinion recognizes that its requirement of "more than a modicum of work time on a vessel" is not susceptible of objective quantification, and that the new doctrine will require employers and claimants to

endure the caldron of case-by-case development. I think that relegating the participants in workers' compensation schemes to a protracted common-law evolution of principles governing which of two compensation regimes applies in a given case is a misinterpretation of both congressional intent and the Supreme Court's interpretation of the Longshore and Harbor Workers' Compensation Act. In addition, it is plainly in conflict with the policy favoring expeditious but limited compensation to injured workers, that underlies all programs of workers' compensation, whether at the federal or state level. I therefore respectfully DISSENT.